**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID LEIBOWITZ, Chapter 7 Trustee of McDonough Associates, Inc.,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 15 C 3021** |
| **BOWMAN INTERNATIONAL, INC. f/k/a Bowman International, LLC and Bowman Consulting Group, Ltd.,** | ) ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

McDonough Associates, Inc. (MAI) entered bankruptcy after some of its creditors filed an involuntary petition. After the petition was filed, MAI allegedly transferred some of its assets to Bowman International, Inc. and Bowman Consulting Group, Ltd. (together, Bowman). The bankruptcy court then appointed David Leibowitz as trustee for the MAI estate. The Trustee has brought claims against Bowman to void the transfer as unlawful under 11 U.S.C. § 549 (claim 1) and to hold Bowman liable for MAI's debts under a theory of successor liability (claim 2). Bowman has moved for summary judgment on both claims. Bowman has also moved to bar the testimony of the Trustee's expert, John Pruitt. The Trustee has moved to strike three of the affirmative defenses that Bowman raised in its answer.

For the reasons stated below, the Court denies Bowman's motion for summary judgment on both claims. The Court also denies Bowman's motion to bar Pruitt's

testimony and the Trustee's motion to strike three of Bowman's affirmative defenses.

## Background

MAI was an engineering consulting firm that worked primarily on projects for the Illinois Department of Transportation (IDOT) and the Illinois State Toll Highway Authority. In June 2012, IDOT suspended MAI from conducting any business with IDOT due to overbilling and fraud. MAI lost a substantial portion of its income and became unable to make payments to its secured creditor, Associated Bank. On June 13, 2012, Associated issued MAI a notice of default. Soon after, the two entered into a forbearance agreement under which MAI agreed to find a buyer for its business.

That same month, MAI entered into discussions for a potential sale with Bowman, a national engineering consulting firm based in Virginia. In July 2012, Bowman conducted a review of MAI's business and records. On September 21, the two companies entered into a letter of intent in which Bowman agreed to purchase MAI's assets. In October and November, Bowman continued to review MAI's financial records, customer contracts, and computer system. Bowman interviewed MAI employees and began the process of qualifying to receive projects from IDOT and the City of Chicago.

MAI's financial situation continued to decline. In November 2012, Associated told MAI that if a sale of the assets did not close by November 30, Associated would foreclose. Senior managers of Bowman and MAI met at MAI's offices on November 30 to close the sale. While the meeting was taking place, three of MAI's other creditors filed an involuntary bankruptcy petition. When Bowman's lenders learned of the petition, they decided they would no longer consent to the transaction. Bowman and

MAI never executed the asset purchase agreement. MAI then told the petitioning creditors that the Bowman deal was dead. Associated froze MAI's bank account and began to plan how it would collect MAI's receivables, on which Associated had a lien.

Despite these adverse developments, Bowman and MAI managers continued to meet for the rest of the day and eventually reached a new agreement. The parties dispute the nature of this agreement. Regardless, a number of changes occurred at MAI in the following days. Feroz Nathani, the president of MAI, and Dan Curley, another employee, informed MAI employees that the company was closing. Many MAI employees left MAI and were immediately hired by Bowman. The parties dispute whether MAI fired the employees before they were hired by Bowman. Bowman made Matthew Letson, a senior MAI employee, a vice president and put him in charge of Bowman's new Chicago office. Nathani resigned from MAI and became an executive vice president of Bowman; he also joined Bowman's board of directors. In all, Bowman hired twelve former MAI shareholders. The parties dispute whether these employees also became shareholders of Bowman; Bowman claims that they did not. The employment agreements between Bowman and these new hires provided for distribution of Bowman stock to them within sixty days of hiring as well as over the course of their employment. As of the time of this litigation, Bowman has not issued any of these shares.

MAI also assigned the lease for its Chicago office space to Bowman. Bowman took over the space and began to use MAI's furniture, equipment, and electronic files. Bowman also began transferring employees' files from MAI equipment to Bowman systems. Bowman began contacting former MAI clients to indicate that many from the

MAI team were coming on board and to offer Bowman as a replacement on MAI's uncompleted projects. According to Bowman, Alan Swanson, an officer and director of MAI, assigned MAI's contracts with the City of Chicago to Bowman in February 2013. The Trustee agrees that Swanson purported to do this but argues he lacked authority to do so because he was already working for Bowman at the time.

Meanwhile, Curley stayed with MAI to oversee the bankruptcy proceedings. During this time, Curley and Swanson (while still with MAI) often communicated by e-mail with MAI's counsel, Stephen Brown, regarding the bankruptcy proceedings. Swanson also forwarded these e-mails to Nathani, who by that point had already left MAI to join Bowman. On the day that the creditors filed the involuntary petition, Brown had told the creditors that MAI would not contest the petition. On December 5, 2012, however, MAI told the bankruptcy judge that it was opposing the involuntary petition. The bankruptcy court appointed Leibowitz as Trustee in February 2013. At that time, the Trustee abandoned some MAI records that were still at the Chicago property but retained many as well. Likewise, the Trustee obtained permission from the bankruptcy court to abandon or sell some of the telephone and computer equipment that Bowman was not using.

The Trustee then filed the current complaint against Bowman. The Trustee alleges that Bowman's takeover of MAI's business constitutes a post-petition transfer of MAI's assets and therefore is voidable under 11 U.S.C. § 549. Compl. ¶¶ 76–84. The Trustee further alleges that Bowman's conduct made it a successor of MAI and therefore liable for all of MAI's debts. *Id.* ¶¶ 85–92. In its answer, Bowman denies the Trustee's allegations and raises a number of affirmative defenses, including the

following: 1) any recovery under claim 1 should be reduced by value Bowman may have provided to MAI during the exchange; 2) the Trustee has unclean hands, which should prevent his recovery under claim 2; and 3) MAI was at least as responsible for the damage to its bankruptcy estate, and therefore the Trustee should be barred from recovering under claim 2 on the basis of *in pari delicto*.

Bowman moved for summary judgment on both of its claims and moved to bar the expert testimony of Pruitt. The Trustee moved to strike the three affirmative defenses discussed above. In this decision, the Court considers all three motions.

## Discussion

## I. Bowman's motion for summary judgment

Because Bowman has moved for summary judgment, the Court views the evidence in the light most favorable to the Trustee and draws reasonable inferences in his favor. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681 (7th Cir. 2014). Summary judgment is appropriate only when the record discloses no dispute on any material fact. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir. 2002). If a reasonable jury could return a verdict for the non-moving party, the court should deny summary judgment. *See Bunn*, 753 F.3d at 681.

### A. Claim 1

In claim 1, the Trustee alleges that Bowman received a post-petition transfer of MAI's assets in violation of 11 U.S.C. § 549. The Trustee alleges that Bowman took over MAI's "space, equipment, unfinished business, and computers" and "took possession of [MAI's] paper and electronic business files." Compl. ¶ 78. In moving for summary judgment, Bowman argues that it did not receive any assets belonging to MAI.

Section 549 authorizes a trustee to avoid a transfer of "property of the estate that occurs after the commencement of the case." 11 U.S.C. § 549(a). Once the bankruptcy petition is filed, "all of the debtor's property becomes property of the estate." *Matter of Jones*, 768 F.2d 923, 926 (7th Cir. 1985). The scope of the estate is broad and includes "all interests of a debtor, both legal and equitable." *Id.* These property interests are defined by state law. *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 598 (7th Cir. 2012).

### 1.    Office space

Both parties agree that, after the filing of the involuntary petition, MAI assigned the lease of its office space to Bowman. *See* Def.'s Mem. in Support of Mot. for Summ. J. at 4; Pl.'s Resp. to Def.'s Mot. for Summ. J. at 12. Further, Bowman does not argue that a lease is not a property interest under Illinois law. Bowman instead argues that the lease was not an asset but rather a liability that would have been treated as an administrative expense in bankruptcy, and therefore the trustee cannot avoid the transfer. Def.'s Reply at 3. Section 549 of the Bankruptcy Code, however, does not draw this distinction, and Bowman cites no authority in support of its position. A leasehold clearly qualifies as a property interest under Illinois law and is included in the bankruptcy estate. *See Munroe v. Brower Realty & Mgmt. Co.*, 206 Ill. App. 3d 699, 704–05, 565 N.E.2d 32, 36 (1990); *see also In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 300 (3d Cir. 2000). A reasonable fact-finder could conclude that, in taking over the lease, Bowman received a transfer of MAI assets.

### 2.    Other physical property

The Trustee further alleges that Bowman received from MAI equipment,

computers, furniture, and paper and electronic business files. Again, Bowman does not contend that MAI did not have a property interest in these items. Instead Bowman appears to argue that MAI never transferred these items to Bowman and that the Trustee abandoned this property. *See* Def.'s Mot. for Summ. J. at 6.

There is a genuine factual dispute over whether Bowman received and used this property. Testimony by former MAI employees indicates that Bowman began using these items immediately after the November 30 meeting. *See* Pl.'s Resp. to Def.'s SUDF, Exh. 1 (Letson Dep.) 47:6–22, 50:8–52:3, 59:2–12; Letson Dep., Exh. 259

There is also a genuine dispute regarding whether MAI still retained an interest in this property. First, to the extent that the Trustee abandoned any property, he did not do so until late 2013 through early 2015, long after Bowman began using the property in 2012. *See* P.'s Resp. to Def.'s SUDF, Exh. 6 (Leibowitz Affid.) ¶¶ 5–6. Any later abandonment by the Trustee therefore had no effect on Bowman's use during this period. Further, the Trustee stated that, although he eventually abandoned some furniture and records, he "retained a large quantity of records" as well as computers of MAI employees. *Id.* The Trustee also sold other computer equipment and telephone hardware. Leibowitz Affid. ¶ 6. Finally, the abandonment orders issued by the bankruptcy court state that the Trustee did not waive any rights or arguments with respect to possible litigation. Def.'s SUDF, Exh. R (Abandonment Orders) at 2. A finder of fact could reasonably conclude that Bowman used this property and that it still belonged to MAI. Thus there is a genuine dispute regarding whether Bowman received a post-petition transfer of this property in violation of 11 U.S.C. § 549.

### 3.    Intangible assets

The Trustee also contends that Bowman received a transfer of MAI's intangible assets.  Pl.'s Resp. to Def.'s Mot. for Summ. J. at 6–7.  The Trustee appears to argue that Bowman received MAI's goodwill, including its relationships with employees and customers and its organizational structure.  *See id.* at 7–10.  Bowman argues that MAI's alleged goodwill is actually the personal goodwill of each MAI employee.  Def.'s Mem. in Support of Mot. for Summ. J. at 7.  Further, Bowman contends that, by the time of the alleged transfer, MAI had lost virtually all of its value as a going concern and therefore had nothing to transfer to Bowman.  Def.'s Reply at 4–7.

Under Illinois law, a company's goodwill is an intangible property right and therefore can belong to the bankruptcy estate.  *See Wetekamp v. Lane*, 250 Ill. App 3d 1017, 1025–26, 620 N.E.2d 454, 460–61 (1993).  Illinois courts define goodwill as "the advantages a business has over competitors as a result of its name, location and owner's reputation."  *See Russell v. Jim Russell Supply, Inc.*, 200 Ill. App. 3d 855, 862–63, 558 N.E.2d 115, 121–22 (1990).  "Its value consists of the probability that the customers of the old firm will continue to be customers to the new."  *Id.* at 863, 558 N.E.2d at 121.  In order for a court to protect an interest in goodwill through injunctive relief, the goodwill must have substantial value.  *Id.* at 862, 558 N.E.2d at 121.

There is a genuine factual dispute regarding whether MAI transferred its goodwill to Bowman.  The evidence indicates that Bowman immediately began using MAI's office space, equipment, and files.  *See* Letson Dep. 47:6–22, 50:8–52:3, 59:2–12; Letson Dep., Exh. 259.  Further, Bowman hired twelve MAI employees in December 2012.  Def.'s SUDF ¶ 10; Pl.'s Resp. to Def.'s SUDF ¶ 10.  Bowman contacted many of MAI's

customers who had outstanding projects in order to assert itself as MAI's replacement. Letson Dep. 60:2–65:11. Bowman also asked Letson to prepare a list of all MAI clients whose contracts could be assigned to Bowman. Letson Dep., Exh. 117 B023804, Exh. 265 LEIB04006, Exh. 282 LEIB02554.

Bowman argues that hiring MAI employees is not a transfer of goodwill because MAI fired its employees before Bowman hired them and, in any event, a business does not have a property interest in its employees. There is a genuine dispute regarding whether MAI fired the employees first. Nathani stated that he terminated all MAI employees on the afternoon of November 30. Def.'s SUDF, Exh. F (Nathani Affid.) ¶ 8. Curley testified, however, that a similar notice sent by Louann Maggio was retracted and most MAI employees still came to work the following Monday. Pl.'s Resp. to Def.'s SUDF, Exh. 2 (Curley Dep.) at 106:19–107:7. Curley also testified that Bowman hired the MAI employees between that date and December 7; MAI then sent another termination notice on December 7. Curley Dep. at 107:11–24. This evidence would permit a reasonable finding that MAI did not fire its employees before they moved to Bowman.

Further, the Trustee does not contend that the employees themselves belonged to MAI. Rather, the Trustee contends that MAI orchestrated a transfer to Bowman of its entire organizational structure, including the institutional knowledge transferred by its employees.

There is also a genuine dispute regarding whether MAI's goodwill had substantial value. On November 19, 2012, Brown stated that MAI's "major assets are its going-concern value and receivables." Def.'s SUDF, Exh. L (Brown Dep.) at 201:04–22. It is

true that Brown made this statement before MAI's creditors filed the involuntary petition for bankruptcy. But Brown also made this statement *after* MAI received its IDOT suspension, which is the primary cause that Bowman cites for MAI's alleged lack of value. Brown's statement would permit a reasonable finding that MAI's goodwill had value despite the fact that the company had been suspended from government contracts. Further, in a presentation made to the Bowman board on November 20, 2012 regarding the potential acquisition of MAI, Gary Bowman indicated that despite the fact that the MAI brand may have become "toxic," there was still "much equity in the brand" that Bowman could "extract." Pl.'s Resp. to Def.'s SUDF ¶ 37, Exh. 8 (Business Plan) at B034618. Finally, the Trustee has provided an expert report by John Pruitt, discussed in further detail below. Pruitt performed a discounted cash flow analysis of MAI and estimated the value of its assets (less accounts receivables) at approximately $2.4 million. As discussed below, this testimony is admissible and helps create a genuine dispute as to whether MAI possessed valuable goodwill that it transferred to Bowman.

### 4. Customers

To the extent that the Trustee alleges that MAI enabled Bowman to take advantage of MAI's customer relationships, this is included within the concept of goodwill. To the extent that the Trustee alleges that the customers themselves were property of MAI and transferred to Bowman, Illinois law indicates that a business does not have a proprietary interest in customers themselves. *See Prudential Ins. Co. of Am. v. Van Matre*, 158 Ill. App. 3d 298, 307, 511 N.E.2d 740, 745 (1987).

### 5.    Summary

For the reasons described above, there is a genuine dispute regarding whether Bowman received a transfer of property belonging to the bankruptcy estate, including MAI's office space lease, furniture, equipment, files, and goodwill.  The Court denies Bowman's motion for summary judgment on claim 1.

### C.    Claim 2

The Trustee alleges in claim 2 that Bowman has successor liability for MAI's debts under Illinois law.  A corporation that purchases the assets of another corporation generally "is not liable for the debts or liabilities of the transferor corporation."  *Vernon v. Schuster*, 179 Ill. 2d 338, 344–45, 688 N.E.2d 1172, 1175 (1997).  This rule has four exceptions, under any of which a purchasing corporation may have successor liability: "(1) where there is an express or implied agreement of assumption; (2) where the transaction amounts to a consolidation or merger of the purchaser or seller corporation; (3) where the purchaser is merely a continuation of the seller; or (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Id.* at 345, 688 N.E.2d at 1175–76.  Bowman argues that it does not meet any of these exceptions; the Trustee argues that a reasonable fact-finder could find in its favor under exceptions two, three, and four.

### 1.    Continuation

The mere continuation exception applies when the purchasing corporation is merely a continuation or reincarnation of the selling corporation.  *Vernon*, 179 Ill. 2d at 346, 688 N.E.2d at 1176; *Workforce Sols. v. Urban Servs. of Am., Inc.*, 2012 IL App (1st) 111410, ¶ 87, 977 N.E.2d 267, 285 (2012).  This occurs when the purchasing

corporation "maintains the same or similar management and ownership but merely wears different clothes."  *Vernon*, 179 Ill. 2d at 346, 688 N.E.2d at 1176 (internal quotation marks omitted).  Illinois courts have repeatedly held that the key question is whether there is an "identity of ownership" between the two corporations.  *See, e.g.*, *Workforce Sols.*, 2012 IL App (1st) 111410 at ¶ 87, 977 N.E.2d at 285; *Diguilio v. Goss Int'l Corp.*, 389 Ill. App. 3d 1052, 1062, 906 N.E.2d 1268, 1277 (2009); *Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187 ¶ 55, 39 N.E.3d 144, 154 (2015).  "Identity of ownership is based on the common identity of officers, directors, and stock between the selling and purchasing corporations."  *Workforce Sols.*, 2012 IL App (1st) 111410 at ¶ 87, 977 N.E.2d at 285.  Though complete identity is not required, the former owners must "retain a controlling interest in the successor entity."  *Id.* at ¶ 88, 977 N.E.2d at 285.

Bowman argues that no former MAI shareholders became shareholders of Bowman.  In rebuttal, the Trustee points to the employment agreements that the former MAI employees signed with Bowman.  In these agreements, Bowman promised the new hires stock signing bonuses, as well as various stock awards over the course of their employment.  Pl.'s Resp. to Def.'s SUDF, Exh. 32 (Employment Agreements).  But the Trustee has failed to provide evidence from which a reasonable fact-finder could find that these stock awards would result in former MAI shareholders possessing a controlling share of Bowman.  Because of this, no reasonable fact-finder could find that Bowman was a mere continuation of MAI.

### 2.     Merger

Under the merger exception, a court can impose successor liability based on

either a *de jure* or *de facto* merger.  *Steel Co. v. Morgan Marshal Indus., Inc.*, 278 Ill.

App. 3d 241, 248, 662 N.E.2d 595, 599 (1996).  The Trustee does not argue that there

was a *de jure* merger.  Instead, the Trustee claims there was a *de facto* merger

between Bowman and MAI.  In order to establish a *de facto* merger, the following

factors must be present: (1) a continuity of the business enterprise between seller and

buyer, including continuity of management, employees, location, general business

operations and assets; (2) a continuity of shareholders, in that shareholders of the seller

become shareholders of the buyer so that they become a constituent part of the buyer

corporation; (3) the seller ceases operations and dissolves as soon as possible after the

transaction; and (4) the buyer assumes those liabilities and obligations necessary for

the uninterrupted continuation of the seller's business.  *Id.* at 248, 662 N.E.2d at 599–

600.

The Trustee has presented sufficient evidence from which a reasonable fact-

finder could find successor liability under the *de facto* merger exception.  First, the

evidence presented by the Trustee shows a continuity of MAI's business enterprise.  As

discussed in detail above, many employees moved from MAI to Bowman.  One MAI

manager became the head of Bowman's Chicago office, and the former president of

MAI became an executive vice president and a director at Bowman.  The Trustee's

evidence shows—and Bowman does not dispute—that Bowman took over the very

location from which MAI ran its operations.  And Bowman, with the help of its new

employees from MAI, contacted many of MAI's former clients in order to continue MAI's

projects.

Second, it is also undisputed that MAI wound up its operations throughout the

course of the bankruptcy.  *See* Def.'s SUDF ¶ 53; Pl.'s Resp. to Def.'s SUDF ¶ 53.

Third, a reasonable fact-finder could find that Bowman assumed certain liabilities of MAI in order to prevent interruptions in the business.  The parties agree that Bowman assumed MAI's lease for its Chicago office, and Bowman has repeatedly argued that this lease constitutes a "liability" rather than an "asset."  *See* Def.'s Mem. in Support of Mot. for Summ. J. at 14.  A reasonable fact-finder could find that Bowman assumed this obligation in order to ease the transition between MAI and Bowman.

The only factor about which there remains some dispute is shareholder continuity.  Illinois courts have indicated that this factor is critical in finding successor liability under the merger exception.  *See Steel Co.*, 278 Ill. App. 3d at 248, 662 N.E.2d at 600.  Bowman claims that no shareholder of MAI became a shareholder of Bowman. The Trustee, however, points to the employment agreements issued to the former MAI employees, which provide for $50,000 in initial stock bonuses and other distributions throughout their employment.  Bowman argues—and the Trustee does not contest— that it has not yet distributed these shares to the former MAI employees.  Bowman argues, on this basis, that no MAI shareholders have become Bowman shareholders. This conclusion, however, ignores the realities of the employment agreements.  Letson and Nathani, two former MAI employees, testified during their depositions that the stock distributions were delayed pending the resolution of this case.  Letson Dep. at 11:18– 15:23; Pl.'s Resp. to Def.'s SUDF, Exh. 19 (Nathani Dep.) at 33:22–35:14.  The fact that Bowman may have paused the merger due to litigation does not prevent a reasonable jury from concluding that the employment agreements, once completed, will effectuate a *de facto* merger between Bowman and MAI.

It is worth noting that Illinois law indicates that the merger exception and the continuation exception are often inseparable because both rely on identity of ownership. *See Green v. Firestone Tire & Rubber Co, Inc.*, 122 Ill. App. 3d 204, 210, 460 N.E.2d 895, 899 (1984). Yet this Court concludes that the Trustee can survive summary judgment on the merger exception without having shown that there is a genuine factual dispute regarding whether MAI shareholders maintained a controlling interest in Bowman. This is because mergers rarely result in the absorbed company controlling the absorbing company, whereas a "continuation" is a single corporation transforming itself into an entirely new entity. *See Nilsson v. Continental Mach. Mfg. Co.*, 251 Ill. App. 3d 415, 418, 621 N.E.2d 1032, 1034–35 (1993). Logically therefore, the merger exception does not require continuity of controlling shareholders, but only continuity of some shareholders. To survive summary judgment on the merger exception, it is sufficient that the Trustee has provided evidence from which a reasonable finder of fact could conclude that MAI shareholders became Bowman shareholders, even if they did not obtain a controlling stake in Bowman.

A reasonable fact-finder could conclude that Bowman is a successor of MAI under the merger exception. This is sufficient to defeat Bowman's motion for summary judgment on claim 2.

### 3.    Fraudulent purpose

This Court further concludes that a reasonable fact-finder could conclude that Bowman is a successor of MAI under the fraudulent purpose exception. Under this exception, a court may impose liability when "the transaction is for the fraudulent purpose of escaping liability for the seller's obligations." *Charles Austin, Ltd. v. A-1*

*Food Servs., Inc.*, 2014 IL App (1st) 132384 ¶ 29, 23 N.E.3d 534, 539–40 (2014).

Because direct evidence is often lacking, Illinois courts look to "badges of fraud" to determine whether there is an inference of fraud. *Villaverde*, 2015 IL App (1st) 143187 at ¶ 44 , 39 N.E.3d at 151–52. The Court considers whether:

(1) the transfer was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer was disclosed or concealed;

(4) before the transfer was made, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all of the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred;

(9) the debtor was insolvent or became insolvent shortly before or shortly after;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*Id.* There are genuine factual disputes on at least four badges of fraud.

The Trustee has shown that there is a genuine dispute regarding whether MAI transferred its assets to an insider. Even though no MAI employees worked for Bowman prior to the transfer, many employees went to work for Bowman as a direct result of the agreement. Former directors and officers of MAI became directors and officers at Bowman. A reasonable fact-finder could conclude that the MAI executives negotiated the transfer in order to later reap the benefits from the same assets.

The Trustee's evidence also gives rise to a genuine dispute regarding whether Bowman and MAI concealed the transfer from the bankruptcy court. The transfer occurred after the creditors filed the involuntary petition but before the bankruptcy court was able to appoint a trustee, meaning that no outside entity was monitoring the assets of the bankruptcy estate. On multiple occasions, MAI represented to the bankruptcy court that it had not transferred any assets to Bowman. *See* Pl.'s Resp. to Def.'s SUDF, Exh. 27 at 11 ("None of Alleged Debtor's assets were sold, conveyed, or transferred to Bowman . . . ); *id.*, Exh. 28 at 6 (The involuntary petition "actually blew up and destroyed a transaction which would have sold those assets at a return that would have creditors some amount of consolance [sic]."); *id.*, Exh. 30 at 7 ("No transfer of assets, paid or unpaid, took place.").

A reasonable fact-finder could also conclude that Bowman and MAI initiated the transfer in response to the involuntary bankruptcy petition filed against MAI. Neither party disputes the fact that, whatever the nature of the exchange between Bowman and MAI, it took place soon after the filing of the involuntary bankruptcy petition. MAI's creditors had effectively initiated suit against MAI, and a fact-finder could reasonably conclude that MAI initiated a transfer to Bowman due to this suit.

A reasonable fact-finder could further find that MAI did not receive reasonably equivalent consideration for its assets. Neither party contends that MAI itself received any payment from Bowman during this process. It appears that the only benefits of the negotiations went to MAI employees as individuals through their employment agreements with Bowman.

Further, the Trustee has presented evidence that MAI was insolvent when it

made the transfer. As noted, MAI's creditors had filed an involuntary petition placing MAI into bankruptcy, and Bowman itself contends that MAI was effectively defunct. A transfer made under these circumstances suggests that MAI transferred its property to escape liability to its creditors.

What's more, the Trustee has provided direct evidence of a possible intent to defraud. In an email dated December 5, 2012, Swanson wrote to a friend describing the situation between Bowman and MAI. Pl.'s Resp. to Def.'s SUDF, Exh. 25 (Swanson Dep.) at Exh. 231 LEIB00973. Swanson wrote:

> It looked like the deal was dead, but since the Bowman guys weren't scheduled to fly home until 9 pm, we kept working on possible structures. We had always planned on a 30-35 person Bowman Chicago and worked up a plan to be turning a profit within 6 months. That is all still doable so we started the process by having 20 people quit MAI on Monday and join[ ] Bowman. The remaining 10 or 12 will stay with MAI on an interim basis to wind up contracts and final billing and then leave for Bowman as well. The buzzards could then pick over the carcass. The only entity that will get anything out of it is the bank which means the State will come up empty which is what they deserve.

*Id.* A reasonable fact-finder could find that MAI transferred its assets in order to evade its liabilities to other creditors.

Based on the above evidence, this Court finds a genuine dispute regarding whether there was a transfer that exhibited badges of fraud. The Court therefore denies Bowman's motion for summary judgment on claim 2.

## II.     Motion to bar testimony

The Trustee has disclosed as his expert John Pruitt, a valuation expert who specializes in valuations of engineering firms similar to MAI. Pl.'s Resp. to Def.'s Mot. to Bar Testimony at 1. Pruitt used the discounted cash flow (DCF) method to estimate the value of MAI—without its accounts receivables—at approximately $2.4 million. Def.'s

Mot. to Bar Testimony, Exh. A (Pruitt Report) at 44. Bowman has moved to bar Pruitt's testimony on the ground that it does not satisfy the standard established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Specifically, Bowman argues that 1) the DCF method is inapplicable to MAI because it was a failing company; 2) Pruitt's assessment was based on a flawed definition of goodwill; and 3) Pruitt erred in relying on a pro forma financial plan prepared by Bowman during negotiations. Def.'s Mot. to Bar Testimony at 10.

### A. DCF method

Bowman first argues that the DCF method used by Pruitt is not appropriate for "non-functioning businesses." *Id.* at 11. Bowman does not cite to any case that disclaims use of the DCF method under these circumstances. There are numerous examples of courts using the DCF method to value companies in bankruptcy. *See, e.g.*, *United Air Lines, Inc. v. Regional Airports Improvement Corp.*, 564 F.3d 873 (7th Cir. 2009). Though some cases imply that this method is misleading for a company on its deathbed, *see In re CXM, Inc.*, 336 B.R. 757, 760–61 (Bankr. N.D. Ill. 2006), this does not require the Court to bar Pruitt's testimony. Bowman is free to use this argument to cross-examine the reliability of Pruitt's report at trial.

### B. Definition of goodwill

Bowman next argues that Pruitt erred in its assessment of goodwill by including the value brought by the individual employees to claim that MAI had its own value as a going concern. Def.'s Mot. to Bar Testimony at 11–12. Bowman accurately notes that a company's future cash flows that are attributable to employee skills and labor, rather than the company's assets, are not part of a company's goodwill. *See Matter of Prince*,

85 F.3d 314, 322 (7th Cir. 1996). A company's goodwill "includes the company's name recognition, consumer brand loyalty, or special relationships with suppliers and customers." *Id.* Pruitt relied primarily on these aspects of MAI's business when valuing its assets. *See* Pruitt Report at 23–26. Pruitt does discuss the value brought by the professional staff. He appears to do so, however, in the context of determining whether the MAI brand retained value after its suspension. For example, Pruitt notes that no employee received disciplinary reaction in the suspension and therefore "the suspension did not sully the reputation of the professional staff of McDonough." *Id.* at 26. Pruitt also points to the fact that MAI employees helped Bowman assume MAI's work as evidence that McDonough's name and intangible assets still had goodwill value. *Id.* Bowman has provided the Court no basis to find that Pruitt's analysis was unreliable or contrary to accepted methodology.

### C. Pro forma financial plan

Bowman does not cite to any case law to support its contention that Pruitt erred in relying on a pro forma financial plan produced by Bowman in valuing MAI's assets. That aside, Pruitt's report does not appear to rely on this plan when drawing his conclusions. Though Pruitt does offer an estimated value based on the pro forma plan, he ultimately rejects this value in favor of the lower one that he estimated using the DCF method. *Id.* at 43–44. Bowman's argument to the contrary is unpersuasive.

For the reasons stated above, the Court denies Bowman's motion to bar Pruitt's testimony.

### III.     Motion to strike affirmative defenses

The Trustee has brought a motion under Fed. R. Civ. P. 12(f) to strike three of the affirmative defenses Bowman asserts in its answer.  Pl.'s Mot. to Strike at 1–2, 6.  As noted by both parties, the Trustee filed its motion more than twenty-one days after Bowman filed its answer containing the affirmative defenses.  Therefore this motion is untimely.  *See* Fed. R. Civ. P. 12(f)(2).  Rule 12, however, also gives a court permission to act on its own to strike insufficient defenses.  Fed. R. Civ. P. 12(f)(1).  A court acting under Rule 12(f) has the discretion "to consider a motion to strike at any point in a case," even when the court's attention "was prompted by an untimely filed motion." *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1399 (7th Cir. 1991).  This Court therefore addresses the merits of the Trustee's motion.

Motions to strike are not favored; a court will strike affirmative defenses only when they are insufficient on the face of the pleadings.  *Id.* at 1400.  Defenses are pleadings and therefore subject to the pleading requirements under Federal Rule of Civil Procedure 8(a).  *See Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1295 (7th Cir. 1989); *Renalds v. S.R.G. Restaurant Grp., Chicago, LLC*, 119 F. Supp. 2d 800, 802–03 (N.D. Ill. 2000).  The Court takes Bowman's allegations as true and may grant the motion to strike only if Bowman does not present "sufficient factual matter" to support a plausible defense.  *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010) (considering a motion to dismiss).

### B.     Defense under 11 U.S.C. § 549

Bowman asserts a defense to claim 1 under 11 U.S.C. § 549.  Under Section 549, a bankruptcy trustee may not avoid a post-petition transfer "to the extent any

value . . . is given . . . in exchange for such transfer." 11 U.S.C. § 549(b). Bowman claims that it conferred value on the bankruptcy estate in two ways: 1) it assumed MAI's lease and therefore relieved the bankruptcy estate of a claim for future rent; and 2) Bowman completed work on some of MAI's contracts and therefore relieved the bankruptcy estate from claims of nonperformance. Ans. ¶¶ 36–38.

The Trustee alleges that the value exception in section 549(b) does not apply here because the transfers were made in "satisfaction or securing of a debt that arose before the commencement of the case" and therefore are still voidable under section 549. *See* 11 U.S.C. § 549(b). But Bowman was never a creditor of MAI. Prior to the transfer, MAI did not owe Bowman any money. Thus MAI's transfers to Bowman could not have been in satisfaction of a debt. The Trustee's argument rests on the premise that the effect of the transfers was to eliminate debts owed by MAI to *other* entities. Pl.'s Mot. to Strike at 7–8. According to the Trustee, this qualifies the transfers as having been made "in satisfaction or securing of a debt." *See* 11 U.S.C. § 549(b). But the fact that the transfers to Bowman eliminated other creditors' claims against MAI's bankruptcy estate does not prevent Bowman from proving that it provided value. In fact, eliminating claims against the estate can constitute value under section 549. *See In re Geothermal Resources Int'l, Inc.*, 93 F.3d 648, 652 (9th Cir. 1996) (implying that relieving the debtor of a contractual obligation has a readily ascertainable value). The Court therefore denies the Trustee's motion to strike Bowman's defense under 11 U.S.C. § 549.

### B.    Unclean hands defense

Bowman asserts unclean hands on the part of the Trustee as a defense to claim

2.  Ans. ¶¶ 39–40.  Bowman essentially alleges that the Trustee has unclean hands because he hired as counsel the same law firm that represents the three creditors who filed the involuntary petition.  Bowman alleges that this law firm was partly responsible for putting MAI into bankruptcy, sinking the original sale to Bowman, and dissuading Associated from taking steps to mitigate Associated's loss in order to preserve future litigation against Bowman.  Def.'s Resp. to Pl.'s Mot. to Strike at 7–9.

Because the bankruptcy court is required to distribute the assets of the bankruptcy estate according to the creditors' rights under state law, the court must permit a defense where state law would permit the defense.  *See Peterson*, 676 F.3d at 598–99.  In *Peterson*, the Seventh Circuit held that a person sued by a trustee in bankruptcy may assert defenses "if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy."  *See id.* (considering a defense of *in pari delicto*).  Under Illinois law, the doctrine of unclean hands "precludes a party from taking advantage of his own wrong" and applies "if the party seeking equitable relief is guilty of misconduct, fraud or bad faith toward the party against whom relief is sought."  *Long v. Kemper Life Ins. Co.*, 196 Ill. App. 3d 216, 219, 553 N.E.2d 439, 441 (1990).

Bowman has sufficiently alleged that the Trustee has unclean hands because he gave up a claim against the petitioning creditors and gave the creditors the opportunity to profit from the damage to the estate they caused by filing for bankruptcy.  Bowman has also sufficiently alleged that the Trustee actively discouraged Associated—MAI's secured creditor—from taking steps to recover its assets in order to improve the case against Bowman.  *See* Def.'s Resp. to Pl.'s Mot. to Strike at 8.  The Court therefore denies the Trustee's motion to strike the defense of unclean hands.

## C.  *In pari delicto* defense

Bowman also asserts the doctrine of *in pari delicto* as a defense to claim 2.  Ans. ¶¶ 41–42.  Bowman alleges that acts by MAI's principals were equally, if not more, at fault for the deterioration of the bankruptcy estate.  *Id.*  ¶ 42.  The Trustee argues that, because it is acting in the interests of MAI's creditors and not MAI itself, Bowman cannot use MAI's wrongdoing as a defense against the Trustee.

The Trustee argues mainly that permitting this defense would negate the purpose of 11 U.S.C. § 549.  It contends this could enable officers of recently bankrupt entities to make collusive transfers to third parties, for which the transferees could then evade liability by blaming the officers, leaving the creditors to suffer for everyone else's misbehavior.  What the Trustee overlooks, however, is the fact that Bowman raises *in pari delicto* as a defense only to the claim of successor liability under Illinois law.  This defense therefore does not apply to a determination of Bowman's liability under 11 U.S.C. § 549 and would not enable third parties to avoid that liability by pointing the finger at the officers of the bankrupt entity.

The Trustee further argues that Bowman should not able to assert the debtor's wrongdoing against a claim brought by the Trustee, who is representing the interests of the creditors.  But this was the exact argument rejected by the court in *Peterson*.  There, the bankruptcy trustee argued that the defendant should not be able to raise the culpability of the bankrupt entity's manager as a defense to a claim brought under state law.  *Peterson*, 676 F.3d at 597.  The Seventh Circuit began by noting that the bankruptcy estate includes property as defined by state law, and this property includes state legal claims *limited by state defenses*.  *See id.* at 598.  Therefore the Trustee has

a right to recover on state law claims, such as a claim of successor liability, only to the extent that would be permitted in light of state law defenses, such as *in pari delicto*. The court went on to expressly hold that "a person sued by a trustee in bankruptcy may assert the defense of *in pari delicto*, if the jurisdiction whose law creates the claim permits such a defense outside of bankruptcy." *Id.* at 598–99. Therefore Bowman can raise this defense if Illinois law permits such a defense to successor liability claims. Because the Trustee has failed to show that Illinois law does not permit this, the Court denies the Trustee's motion to strike the *in pari delicto* defense.

## Conclusion

For the foregoing reasons, the Court denies Bowman's motion for summary judgment [dkt. no. 34], Bowman's motion to bar the valuation testimony of John Pruitt [dkt. no. 37], and the Trustee's motion to strike Bowman's first, second, and third affirmative defenses [dkt. no. 39]. The case is set for a status hearing on November 28, 2016 at 8:45 a.m., in chambers (Room 2188), for the purpose of setting a trial date.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  November 17, 2016